UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MY IMAGINATION, LLC, a Michigan
limited liability company,

    Plaintiff,

v.

M.Z. BERGER & CO., INC., a foreign
corporation; M.Z. BERGER & CO.,
INC., d/b/a MZB INK; and MZB
IMAGINATION, LLC, a New York
limited liability company,

    Defendants.

_____/

Case No. 14-13321

HON. AVERN COHN

**MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, (Doc. 68), GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, (Doc. 70), and DENYING PLAINTIFF'S MOTIONS *IN LIMINE* REGARDING APPLICABLE LAW, (Doc. 66), and FOR DETERMINATION OF DAMAGES AVAILABLE, (Doc. 67)**

I.     INTRODUCTION

A.     The Case

This is a breach of contract case. The contract is in the form of a written agreement relating to an asset purchase of the stationery division of Defendants M.Z. Berger & Co., Inc. and MZB Imagination LLC (collectively, MZ Berger).

In the Asset Purchase Agreement (APA), Plaintiff MY Imagination LLC (My Imagination) acquired inventory and the right to licenses for stationery logos used by MZ Berger. The licensors for the logos were:

- Lego
- Nickelodeon
- Universal
- Mars Retail Group
- Activision Publishing
- A&E Television
- Cartoon Network
- Depesche USA
- Dreamworks Animation
- KID Genius
- OBB II
- Polyblank Designs
- Sega
- TBox

Assignment of licenses was subject to approval by the licensors.  Additionally, My Imagination acquired the goodwill of the stationery division as reflected in a Bill of Sale (BS) attached.  The APA did not include a non-compete provision.

My Imagination says MZ Berger breached provisions of the APA relating to assignment of licenses by not cooperating in obtaining the agreement of licensors to the assignment.  My Imagination also says MZ Berger breached a covenant implied from the sale of goodwill of the stationery division not to solicit the division's customers.

## B.     The Parties

MZ Berger is an "accessory company" and wholesaler of watches, clocks, toys and other consumer goods.  MZ Berger also had a stationery division which sold back-to-school items including notepads and erasers bearing logos of popular interest.[1]

Barry Rosenbaum was president of the stationery division from 2009 to February 2014, when he left to start his own stationery business.

---

[1] The record does not reflect how MZ Berger operated its stationery division. Apparently, it contracted with manufacturers in Hong Kong for production of product, which it then sold to retailers in the United States.

2

In February, Rosenbaum approached Lego about the prospect of becoming its stationery licensee instead of MZ Berger. Lego recommended that Rosenbaum partner with Sun Yu, one of its toy licensees.

On May 1, 2014, Rosenbaum and Yu filed articles of organization to establish My Imagination. The same day, they executed an operating agreement in which they were the named parties.

The operating agreement provided that Rosenbaum and Yu would each have a 50% interest in the company. (Doc. 73-1 at 7, 28). A section titled "Capital Contributions/Proposed Purchase and Operation of Company Assets/Restriction on Distributions" states:

> <u>Purchase and Operation of Assets</u>. The Company entered into an Asset Purchase Agreement with MZ Berger, LLC, as Seller, for the purchase of certain assets ("Assets") relating to the marketing and sale of Legos licensed products, the terms of which have been unanimously approved by Yu and Rosenbaum. . . .

(*Id.* at 13-14). Rosenbaum was president.

### C.     The Deal

The APA was executed on May 21, 2014.

The record does not disclose when the sale closed, when the BS was executed or when the stationery division began operations.

MZ Berger continued to sell Universal-licensed stationery products pending assignment of the license.

On September 1, 2014, the Lego license was assigned to My Imagination.

On September 12, 2014, MZ Berger sent letters to the licensors named above about assignment of licenses. Universal discussed assignment with My Imagination. On September 22, 2014, Universal declined to assign the license.

In December 2014, My Imagination closed down. In early 2015, the Lego license was assigned to an entity associated with Yu. At the same time, MZ Berger decided to leave the stationery business and told Universal of this. The Universal license that MZ Berger retained was assigned to Innovative Designs, which was a competitor.

### D.     Procedural History

The case was filed on August 26, 2014, (Doc. 1). The initial complaint contained a count for rescission and sought $4.2 million in losses said to have been incurred as a consequence of MZ Berger's breach of the APA, (Doc. 1 at 20).

The next day, My Imagination moved for a temporary restraining order (TRO) requiring MZ Berger to send letters to licensors regarding assignment of licenses under the APA. On September 12, 2014, the Court entered a TRO to this effect.

On April 23, 2015, an amended complaint was filed, (Doc. 42), attached to which was a copy of the APA and a draft of the letters to licensors proposed by MZ Berger.

The counts of the amended complaint are:

Count I:     Breach of Contract,

Count II:    Breach of the Implied Covenant Not to Compete,

Count III:   Fraudulent Inducement,

Count IV:    Tortious Interference with Business Expectancy,

Count V:     Breach of Implied Covenant of Good Faith and Fair Dealing, and

Count VI:    Conversion

Counts I, II and V are contract counts. Counts III, IV and VI are tort counts.

The amended complaint does not mention rescission. As to injury, it states:

> The delays and Defendants' conduct relative to the Licenses, Licensor Letters, and usurpation of Plaintiffs business opportunities directly forced

4

Plaintiff to cease doing business and begin winding down its corporate affairs in early 2015.

(Doc. 42 at 13).

In a Statement of Claims requested by the Court, My Imagination estimated it had incurred $3.5 million in losses as a consequence of MZ Berger's breach of the APA, (Doc. 45 at 4), plus $1.2 million in litigation costs, (Doc. 89 at 6).

## II. MOTIONS

### A. Summary Judgment

#### 1. Legal Standard

Summary judgment will be granted if the moving party demonstrates that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *In re Dollar Corp.*, 25 F.3d 1320, 1323 (6th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). In doing so, the Court "must view the evidence in the light most favorable to the non-moving party." *Emp'rs Ins. of Wausau v. Petrol. Specialties, Inc.*, 69 F.3d 98, 101 (6th Cir. 1995).

#### 2. Particular Motions

The summary judgment motions before the Court are:

- My Imagination's Motion for Partial Summary Judgment as to Count I (Breach of Contract), (Doc. 68), and

- MZ Berger's Motion for Summary Judgment as to Counts I-VI, (Doc. 70)

The motions are accompanied by:

- a Corrected Joint Statement of Facts for Plaintiff's Motion for Partial Summary Judgment, (Doc. 92), and

- a Joint Statement of Facts for Defendants' Motion for Summary Judgment, (Doc. 94),

- together with supporting exhibits.

The exhibits consist of deposition testimony and e-mails of corporate officers including:

- Rosenbaum,

- Bernard Marmelstein, chief executive officer (CEO) of MZ Berger, and

- Tricia Chavez, a vice president of licensing at Universal.

### a. My Imagination's Motion for Partial Summary Judgment

My Imagination says MZ Berger breached the APA with respect to:

- the licenses, and

- sale of goodwill of the stationery division.

Specifically, My Imagination says:

- MZ Berger caused undue delay in the sending of licensor letters, and

- failed to help My Imagination in securing assignment of the Universal license.

Instead, My Imagination says:

- MZ Berger continued to sell Universal-licensed stationery products while

- My Imagination sought assignment of the Universal license.

My Imagination says this conduct by MZ Berger caused it to close down.

### b. MZ Berger's Motion for Summary Judgment

MZ Berger says there was no material breach of the APA because:

6

- MZ Berger did not interfere with the assignment of licenses, and

- had the right to continue in the sale of stationery products until the licenses were assigned.

Additionally, MZ Berger says:

- Universal's decision not to assign the license to My Imagination was independent of any actions by MZ Berger.

As to Counts II-VI, MZ Berger says:

- Counts II and V (contract counts) must be dismissed as duplicative of Count I (Breach of Contract), and

- Counts III, IV and VI (tort counts) must be dismissed as they are interwoven with the contract claims and not extraneous to the APA.

### 3. Disposition

For the reasons below, summary judgment in favor of MZ Berger is appropriate as to Counts I-VI. My Imagination's motion for summary judgment, (Doc. 68) is DENIED, and MZ Berger's motion for summary judgment, (Doc. 70), is GRANTED.

### B. Motions *In Limine*

### 1. Particular Motions

The motions *in limine* before the Court are:

- My Imagination's Motion *In Limine* Regarding Applicable Law as to Counts III, IV and VI (tort counts), (Doc. 66), and

- My Imagination's Motion *In Limine* for Determination of Damages Available for Breach of Contract, (Doc. 67)

As to the motion *in limine* regarding applicable law, My Imagination says:

- Michigan law applies to the tort counts notwithstanding the APA's New York choice-of-law provision.

As to the motion *in limine* regarding damages, My Imagination says:

7

- it is entitled to rescissory damages contrasted to contract damages on the grounds the latter are speculative.[2]

### 2. Disposition

There is no need to address the motions *in limine* regarding the applicable law, (Doc. 66), and damages, (Doc. 67), which are DENIED as moot.[3]

### III. DISCUSSION

### A. Terms of the APA

### 1. Subject Matter

In describing the assets sold, the BS, (Doc. 42-2 at 39), reads:

<u>Schedule 1 to Bill of Sale</u>

a. The balance of the Inventory (as defined in and subject to Section 4.3 of the Purchase Agreement);

b. All computer systems files used exclusively by Buyer's employees;

c. The Open Customer Orders (subject to Section 4.3 of the Purchase Agreement);

d. Seller's rights, title and ownership in and to its patents, trademarks, copyrights and other intellectual property (subject to Section 4.3 of the Purchase Agreement);

e. All of Seller's computer-aided designs;

f. All of Seller's product samples in Seller's possession at its headquarters or in China;

---

[2] The APA appears to have a $1 million cap on the damages owing for a breach of contract. (*See* Doc. 42-2 at 24, 26-27).

[3] As to governing law, the motion papers do not display any difference between New York and Michigan law as to the tort counts. Absent a substantive difference, there is little need for the Court to resolve which law should apply. As to damages, the rescission count was not carried over to the amended complaint which establishes the parameters of My Imagination's claim. As pleaded, there is no basis to find that damages must be measured under a theory of rescission.

    g. All of Seller's rights and interest in molds and tooling at its factories in connection with products sold in the Seller's Business, without any representations or warranties, as set forth in the Supplement to Schedule 1.2 to the Purchase Agreement entitled "Tooling";

    h. Seller's accounts receivables from Gold Phoenix (estimated at approximately $74,000.00);

    i. The goodwill associated with the Business;

    j. Seller's UPC (to the extent assignable); and

    k. Seller's rights (to the extent they exist) in the License Agreement dated December 2009, by and between Seller, as Licensor and LaRose Industries, LLC, a New Jersey Limited Liability Company, with offices at 1578 Sussex Turnpike, Randolph, NJ 07869, as licensee (license to Spray-Art trademark).

In describing the payment by My Imagination, (*id.* at 11-12), the APA reads:

    3.     <u>Assumption of Certain Liabilities</u>. The Parties agree that on and at all times after the Effective Date, and in accordance with the provisions set forth in Section 4.3 herein, Buyer shall also assume liability for certain liabilities of the Business and/or arising from the Assets acquired by Buyer hereunder (collectively, the **"Assumed Liabilities"**). Such Assumed Liabilities shall specifically include:

        3.1     Those accounts payables, and all payables and related expenses arising from and/or relating to all in-transit Inventory acquired hereunder, without limitation, which are due or claimed by any and all suppliers of in-transit Inventory, plus disputed payables (collectively, the **"Payables"**) as specifically set forth on **Schedule 3.1** annexed hereto;

        3.2     Those open factory purchase orders and WIP (collectively, the **"Open Factory Purchase Orders"**) placed by Seller in connection with Seller's business as specifically, delineated on **Schedule 3.2** annexed hereto;

        3.3     All obligations and liabilities arising after the Effective Date under all license agreements that are assigned and transferred to Buyer pursuant to this Agreement; including but not limited any novations, extensions, and renewals thereof (herein, **"Assigned Licenses"**), including without limitation all license fees, minimum royalties, earned and

      percentage royalties, advertising fees, payments and/or participations, and all other amounts payable under or in connection with or for all such successfully transferred licenses; provided, however, that the actual effective date for assignment of the Assigned Licenses shall be the Final Shipping Date, subject to the conditions set forth in Section 19.5; and

   3.4    All liabilities arising from the Assets and the conduct of the Business, which liabilities accrue from and after the Effective Date, including without limitation, all charges relating to maintenance of Trademarks.

. . .

4. <u>Purchase Price; Transition of Business</u>.

   4.1.   In consideration for the Assets, Buyer shall pay to Seller the purchase price of One Million Nine Hundred Forty One Thousand and 00/100 Dollars ($1,941,000.00) (the "**Purchase Price**"). The Purchase Price shall be paid as follows: (a) Three Hundred Thousand ($300,000.00) Dollars (the **"Closing Portion"**) shall be paid on the Effective Date in immediately available funds; and (b) the balance of One Million Six Hundred Forty One Thousand ($1,641,000) Dollars (the **"Purchase Price Balance"**), shall be paid in the manner set forth in Section 4.3.

. . .

   4.3.   <u>Transition of Business</u>.

   4.3.1.  As soon as practicable and no later than ninety (90) days after the Effective Date, Buyer shall directly pay all of, or obtain a release of Seller's obligations from, the Payables and the Open Factory Purchase Orders.

### 2. Timetable

The APA provides that:

- MZ Berger will continue to operate the stationery division through August 31, 2014.  A portion of net proceeds will be remitted to My Imagination.

- All licenses will be assigned (if possible) to My Imagination by August 31, 2014.

- All inventory will be delivered to My Imagination by September 18, 2014.

(*See id.* at 8, 10-11, 13-14, 16, 22-23).

### 3. MZ Berger's Obligations

As to licenses, the APA provides that:

- MZ Berger will send letters to licensors (licensor letters) by June 3, 2014,

- MZ Berger "will work with [My Imagination] in good faith to prepare and send out the Licensor Letters . . . ," and

- MZ Berger "will use commercially reasonable efforts in good faith to help [My Imagination] with the transfer of all licenses."

(*See id.* at 9, 21-23). Describing the licensor letters, the APA reads:

> letters which the Parties shall collaborate on and which Seller shall send . . . to each and every one of its licensors informing them, as applicable, that Seller is selling substantially [all] of its Assets to the Buyer and/or requesting that licensor consent to the assignment of the license to Buyer.

(*Id.* at 9).

### 4. Exclusions

The APA provides that:

- "[MZ Berger] makes no representation or warranty as to the assignability of any license or of the likelihood of any licensor to give its consent with respect to any such transfer or assignment," and

- the APA reflects "the entire agreement of the Parties" and "supersedes all" prior oral representations.

(*Id.* at 21, 32).

### B. Licenses

Under Count I (Breach of Contract), My Imagination claims that MZ Berger breached obligations under the APA to assist in the assignment of licenses by providing letters and cooperation. My Imagination says this conduct caused it to close down.

11

**1.**

On June 10, 2014, My Imagination sent a draft licensor letter to MZ Berger. On August 19, 2014, MZ Berger responded with a counter letter that did not mention assignment of licenses.

The parties were unable to agree on the form of the letter in advance of the Efficient Collaborative Retail Marketing (ECRM) trade show on September 14-18, 2014, where My Imagination was to present its 2015 stationery line to retailers.[4]

After licensor letters were sent and the trade show concluded, Universal declined to assign the license on September 22, 2014. (*See* Doc. 74-5). The Joint Statement of Facts for Defendants' Motion for Summary Judgment states that:

> Universal made its own decision not to consent to the transfer of a stationery license from [MZ Berger] to [My Imagination]. Universal decided on its own to transfer the stationery license to another entity that was more experienced in this area than [My Imagination].

(Doc. 94 ¶ 73). This explanation is reflected in the deposition testimony of Chavez. (*See* Doc. 72-10 at 32-35, 69-71, 77-78). Chavez testified "there was not a whole lot going on" with My Imagination as a new company lacking the capabilities and relationships at retail that Universal desired. (*Id.* at 32-33). She had "another partner in mind," Innovative Designs, "the number one player in the market." (*Id.* at 34-35).

**2.**

My Imagination complains that a 3-month delay from June to September 2014 in the sending of the licensor letters was a breach of the APA on the part of MZ Berger that materially contributed to its closing down in December 2014.

---

[4] Licensor letters were sent September 12, 2014 pursuant to the TRO.

It is undisputed that the licensor letters were sent, albeit late, after both parties failed to "collaborate" on the form of letters under the APA. My Imagination was able to obtain the assignment of the Lego license before the letters were sent.

After the letters were sent, Universal had discussions with My Imagination about assignment of the Universal license. Although Universal declined to assign the license, the reasons cited were My Imagination's lack of capabilities and relationships at retail as a new company. This led Universal to instead choose Innovative Designs, a more experienced stationery seller.

My Imagination points to nothing showing a 3-month delay in sending licensor letters caused Universal not to assign the license instead of the reasons given. There is no genuine issue of material fact and no breach of contract relating to letters.

**3.**

My Imagination asserts that MZ Berger "actively interfered" in its relationship with Universal and acted in derogation of its duties to assure the assignment of the Universal license. However, My Imagination has not identified any overt act of interference by MZ Berger that affected Universal's decision. Nor has it shown that Universal's explanation for its decision was a pretext.

To the contrary, My Imagination stipulates that "Universal decided *on its own* to transfer the stationery license to another entity that was more experienced." (Doc. 94 ¶ 73) (emphasis added). This is corroborated in the testimony of Chavez. Moreover, the APA explicitly provides that there is no guarantee of assignability or licensor consent to the assignment of licenses sold.

There is no support for the assertion that MZ Berger interfered in My Imagination obtaining the Universal license or that such conduct by MZ Berger materially impeded My Imagination's ability to operate in December 2014. There is no genuine issue of material fact and no breach of contract relating to cooperation with respect to licenses.

### C.     Continuation in Business by MZ Berger

Under Count I (Breach of Contract), My Imagination claims that MZ Berger breached a covenant implied with the sale of goodwill of the stationery division in the APA to refrain from soliciting the division's customers to recapture their patronage. My Imagination says this conduct caused it to close down.

### 1.

Marmelstein testified in deposition that in July and August 2014 he e-mailed Wal-Mart and Target sales officials about the Despicable Me stationery line of Universal. (*See* Doc. 68-8 at 79-80, 106-08, 114, 124-25). He testified that he estimated at the time the line would yield $3 to 5 million in sales. (*Id.* at 114).

On July 31, 2014, Marmelstein sent an e-mail to a sales official of Wal-Mart regarding MZ Berger's 2015 back-to-school stationery line. The e-mail read:

> I am writing to bring you up to date on some of the exciting changes that have taken place over the last few weeks with MZB's stationery division.
>
> We are happy to announce that, effective August 1st, we will be bringing in new management and sales teams to oversee this division and to service and help drive sales to the Walmart account.
>
> As the sole licensee for Despicable Me/Minions, and in light of the current success of the spiral notebook and BTS promotion, we are ready to present you with our Spring 2015 product updates.
>
> We realize that time is of the essence to secure placement for the next modular update and are available for a meeting at your earliest convenience.

(Doc. 79-11 at 2). An identical e-mail was sent by Marmelstein to a sales official of Target on August 5, 2014. (*See id.* at 3).

**2.**

A party contracting to sell its business and the business's "goodwill" may not directly solicit customers of the same business after selling it. *Mohawk Maint. Co. v. Kessler*, 52 N.Y.2d 276, 283-86 (N.Y. 1981) (noting the rule keeps a seller from "actively interfer[ing] with the purchaser's relationship with his newly acquired customers by capitalizing upon their personal loyalties to him in an effort to recapture their patronage"). Doing so impairs an essential part of the transaction—the right to "expect that the firm's established customers will continue to patronize the business." *Id.* at 285.

**3.**

It may be that MZ Berger violated the APA by soliciting sales from Wal-Mart and Target in July and August 2014 for Despicable Me stationery products labeled under the Universal license. However, what sales were effected from this solicitation, if any, is unknown, as is whether these customers' purchases were significant.

My Imagination must show that any breach materially impeded its ability to operate in December 2014. With respect to solicitation, it has not done so. My Imagination has not identified a significant volume of sales that MZ Berger made of Universal-licensed stationery products from May through September 2014.

Without a customer list, sales figures and the like, the Court is left to speculate as to the competitive impact of any potential solicitation. There is no genuine issue of material fact and no breach of contract as to solicitation.

### D.     Remaining Contract Counts

Under Count II (Breach of the Implied Covenant Not to Compete), My Imagination restates that MZ Berger improperly solicited customers in connection with the sale of the stationery division's goodwill.  Under Count V (Breach of Implied Covenant of Good Faith and Fair Dealing), My Imagination says that MZ Berger acted in bad faith by representing during negotiation of the APA that it would exit the stationery business post-APA only to continue in business.

#### 1.

With respect to Count II, this count is identical to the claim of solicitation in Count I (Breach of Contract).  As discussed above, there is insufficient evidence that any solicitation by MZ Berger materially impeded My Imagination's ability to operate.

#### 2.

As to Count V, this allegation of bad faith is intertwined with the alleged breaches of contract in Count I (Breach of Contract).  *See Amcan Holdings, Inc. v. Canadian Imperial Bank of Commerce*, 894 N.Y.S.2d 47, 49-50 (N.Y. App. Div. 2010) ("The claim that defendants breached the implied covenant of good faith and fair dealing was properly dismissed as duplicative of the breach-of-contract claim, as both claims arise from the same facts and seek the identical damages for each alleged breach." (citations omitted)).  In any event, My Imagination has not shown MZ Berger acted in bad faith when it represented during negotiations it planned to exit the stationery business following the asset purchase in May 2014, but ultimately did not do so until early 2015.

### E.      Fraudulent Inducement and Tortious Interference

Under Count III (Fraudulent Inducement), My Imagination says that MZ Berger committed fraud in May 2014 by representing that it was exiting the stationery business post-APA.  My Imagination says it never would have entered into the APA, or would have insisted on different terms, had it known MZ Berger would continue in business.

Under Count IV (Tortious Interference with Business Expectancy), My Imagination reasserts MZ Berger interfered with its efforts to secure assignment of the Universal license and cites MZ Berger's failure to provide cooperation with respect to licenses and continuation in the stationery business post-APA.

#### 1.

In *Woodland Harvesting, Inc. v. Georgia Pac. Corp.*, No. 09-10736, 2010 WL 2813339, at *1 (E.D. Mich. 2010) (Cohn, J.), the Court considered a claim of fraudulent inducement by a woodchip supplier who entered into a long-term supply contract with a particle board plant.  *Id.*  Defendant, the plant owner, later closed down the plant and exercised an early termination clause of the contract.  *Id.*  The plaintiff supplier alleged that defendant knew of the plant's planned closure during negotiation of the contract as part of a looming $21 billion proposed acquisition of defendant.  *Id.* at *1-*2.

The Court dismissed the claim under the "economic loss doctrine," which "provides that where a purchaser's expectations in a sale are frustrated . . . , his remedy is said to be in contract alone, for he has suffered only economic damages."  *Id.* at *5, *9-*10 (citation and alteration omitted).  The Court observed that "applicability of the [] doctrine to a claim of fraud turns on whether the parties could have resolved the issue through a contract provision."  *Id.* at *5.  The Court noted "application of the [] doctrine

17

should be based on the distinction between fraud extraneous to the contract and fraud interwoven with the breach of contract." *Id.* at *5 n.8 (citation omitted).

Because the alleged fraud related to omissions with respect to a term of the contract—the early termination clause, the Court determined the claim "c[ould ]not be considered extraneous to the contract," and was barred. *Id.* at *9-*10. The Court said:

> In virtually every contract case involving allegations of fraud, the plaintiff asserts that it would have demanded different terms or refused to sign the contract but for the defendant's misrepresentations. Such a showing is insufficient to avoid the economic loss doctrine.

*Id.* at *10.[5]

**2.**

With respect to Count III (Fraudulent Inducement), My Imagination has not shown MZ Berger misrepresented its intentions about the timing of its exit from the stationery business. By all accounts, MZ Berger intended to exit following the APA in May 2014 but delayed doing so until early 2015 to continue selling products that MZ Berger retained when Universal declined to assign the license. This does not evince fraud on the part of MZ Berger but instead its reaction to a change in circumstances represented by Universal's decision not to assign the license.

The claim is also barred under the economic loss doctrine for the reason articulated by the Court in *Georgia Pacific*, 2010 WL 2813339, at *10:

> In virtually every contract case involving allegations of fraud, the plaintiff asserts that it would have demanded different terms or refused

---

[5] *See also Hadari v. Leshchinsky*, 662 N.Y.S.2d 85 (N.Y. App. Div. 1997) ("A cause of action for fraud cannot stand where, as here, the only fraud alleged relates to a breach of contract. Moreover, '[a breach of] contract action may not be converted into one for fraud by the mere additional allegation that the contracting party did not intend to meet his contractual obligation.'" (citation omitted)).

18

to sign the contract but for the defendant's misrepresentations. Such a showing is insufficient to avoid the economic loss doctrine.

### 3.

As to Count IV (Tortious Interference with Business Expectancy), My Imagination has not offered sufficient evidence that MZ Berger interfered in My Imagination obtaining the assignment of the Universal license or that any solicitation by MZ Berger materially impeded My Imagination's ability to operate. Moreover, the allegations relate only to the terms of the APA and are barred by the economic loss doctrine.

### F. Lisa Frank

Count VI (Conversion) relates to stationery inventory under the Lisa Frank label, sold by MZ Berger subsequent to the signing of the APA, that My Imagination says should have been turned over to it.[6]

### 1.

According to My Imagination, it was entitled to take possession of the Lisa Frank inventory under the APA. Instead of turning it over, MZ Berger sold the inventory to a third party because Lisa Frank would not approve the transaction. My Imagination says this was conversion because, notwithstanding its receipt of the sale proceeds, it could have sold the inventory for more on its own.

### 2.

It is undisputed that My Imagination was paid the proceeds of the inventory that Lisa Frank refused to allow My Imagination to have or sell after the APA was executed. The Court declines to convert such a claim arising from a contract into a tort of

---

[6] The parties agree that the Lisa Frank stationery was part of the inventory purchased in the APA.

conversion when the property sold was to the benefit of My Imagination. *See Aroma Wines & Equip, Inc. v. Columbian Distribution Servs., Inc.*, 497 Mich. 337, 359 (Mich. 2015) (holding that "someone alleging conversion to the defendant's 'own use' under MCL 600.2919a(1)(a) must show that the defendant employed the converted property for some purpose personal to the defendant's interests . . .").

SO ORDERED.

s/Avern Cohn
AVERN COHN
UNITED STATES DISTRICT JUDGE

Dated: January 30, 2017
Detroit, Michigan